A91A0960. MARETT v. PROFESSIONAL INSURANCE CAREERS, INC.
(410 SE2d 373)

SOGNIER, Chief Judge.

Professional Insurance Careers, Inc. brought suit against William W. Marett, Sam Foreman, Harry Butler, and National Trust Fire Insurance Company to recover a fee allegedly owed under an executive recruiting contract. The trial court directed a verdict in favor of Butler and Foreman, and the jury returned a verdict in favor of National Trust and against Marett individually. Marett appeals.

The facts were sharply disputed at trial on the crucial issues of whether a contract existed between appellee and any of the defendants; whether the executive recruit was actually employed by the defendants; and whether appellant was individually liable either because he contracted with appellee in his individual capacity or because he disregarded the corporate form so as to justify piercing the corporate veil. Lee Richards, appellee's president, testified that appellee was engaged in the business of providing executive search services to the insurance industry. Evidence was adduced that NTFI Holdings, Inc. (hereinafter the "holding company"), a Tennessee corporation not a party to this litigation, was incorporated on January 5, 1987 by appellant and his co-defendants Butler and Foreman (hereinafter the "investors") for the purpose of acquiring the stock of defendant National Trust Fire Insurance Company (hereinafter the "insurance company"). Richards testified that in early 1987 he learned of this purchase of the insurance company from an accountant who was advising the holding company, and that the accountant informed him

the investors intended to hire a chief executive officer ("CEO") to run the insurance company. Richards then sent appellant a letter and accompanying documentation explaining the services provided by appellee and the fee structure used.

As a result of this solicitation, Richards testified, he met with appellant on May 15, 1987 to discuss the insurance company's employment needs. Richards stated that he offered appellee's services to locate a suitable CEO and that appellant orally accepted this offer. On the question whether this oral contract was entered into by appellant individually or by the holding company or the insurance company, Richards testified variously that "I don't really know who the client was"; that "[appellant] was my client"; that "I understood my client to be [appellant], representing the other two venture partners"; and that when he filled out appellee's standard "search assignment form" during this meeting, he wrote "Marett Properties" (an entity not involved in this litigation) and "[the holding company]" in the box labeled "client." He testified that he mailed subsequent correspondence to appellant at the Marett Properties address, although he did acknowledge that Marett Properties probably was not the client since it was not in the insurance business.

Richards testified further that he referred Herbert Sands to appellant in 1987, that Sands was employed by the insurance company in May 1988 at a base salary of $150,000, and that appellee's ensuing invoices to appellant for a fee of $45,000 for procuring Sands's services were not paid. Sands testified by deposition that he considered himself to have been employed by the insurance company as president and CEO as of May 16, 1988, and that he resigned his former position and relocated to Atlanta to begin work. He stated that he refused to sign the employment contract offered by the insurance company until the investors obtained adequate funding, and that he resigned the CEO position in late August because of the continued lack of capitalization. He deposed further that his first paycheck was issued by Marett Properties and that all subsequent paychecks he received were written on the insurance company's payroll account, which he set up as part of the performance of his duties as CEO.

Appellant testified that the investors' desire to enter the property and casualty insurance business led to their purchase of the insurance company, which he described as a shell corporation with no outstanding policies, because it was already licensed to do business as an insurer. He testified that because of the way the purchase was financed, the insurance company had a negative net worth after the acquisition. He explained that the investors' plan was to seek additional investors to contribute $5,000,000 in capital so that the company could begin writing insurance policies, but that the holding company eventually sold the insurance company because of its inability to obtain this nec-

essary capital. Appellant testified further that he was a principal in 27 corporations and partnerships, many of which were organized for tax purposes and operated out of the same office. He stated that he frequently wrote paychecks for the employees of these various entities from the account of one of the corporations and then reimbursed the account with funds from the other entities.

With regard to liability for appellee's fee for locating Sands, appellant acknowledged meeting with Richards and agreeing to pay a fee if appellee found an acceptable candidate for the CEO position, but testified that at all times he acted on behalf of the holding company, not individually. He stated that Sands was never employed as CEO because he failed to execute the employment contract and that the insurance company paid Sands only as a consultant. Appellant also denied having agreed to the fee structure claimed by appellee.

1. Appellant contends the trial court erred by denying his motions for directed verdict and for judgment n.o.v. made on the ground that the evidence failed to justify piercing the corporate veil of the holding company or otherwise establish his individual liability.

(a) We first address appellee's contention that this enumeration cannot be considered because appellant moved for directed verdict only at the end of appellee's case and failed to renew his motion at the close of the evidence. Although OCGA § 9-11-50 (b) provides that a motion for judgment n.o.v. may be made "[w]henever a motion for a directed verdict made at the close of all the evidence is denied," the Supreme Court held in *Department of Transp. v. Claussen Paving Co.*, 246 Ga. 807, 809 (2) (273 SE2d 161) (1980) that the statutory phrase "at the close of all the evidence" "do[es] not deny to a defendant who has moved for a directed verdict at the close of the plaintiff's evidence the opportunity to move for judgment [n.o.v.] on the grounds presented in his motion for directed verdict." *Battle v. Yancey Bros. Co.*, 157 Ga. App. 277 (277 SE2d 280) (1981), cited by appellee, does not provide authority to the contrary, for that case relied on two cases previously overruled in *Claussen Paving*, supra at 808-809 (2). Accordingly, the trial court's denials of both motions are properly before us.

(b) As to the merits of appellant's appeal, we agree with him that the trial court erred by submitting to the jury the question whether the evidence authorized piercing the corporate veil. To establish a basis for disregarding the corporate entity on the ground that the corporation is a mere alter ego of an individual, "it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and [that] to adhere to the doctrine of corporate entity would promote injustice or protect

fraud. [Cits.]" (Punctuation omitted.) *Trans-Amer. Communications v. Nolle*, 134 Ga. App. 457, 460 (1) (a) (214 SE2d 717) (1975). The evidence adduced at trial did not present a jury question under this test. Appellant readily acknowledged that the holding company was not sufficiently capitalized to begin operations; however, undercapitalization of a corporation will justify piercing the corporate veil only when "coupled with evidence of an intent at the time of the capitalization to improperly avoid future debts of the corporation." *Hickman v. Hyzer*, 261 Ga. 38, 40 (1) (401 SE2d 738) (1991). Here, appellant offered a valid business reason for the manner in which the acquisition was financed and gave an unrebutted explanation of the investors' capitalization plans and the ultimate failure of that effort. Thus, there is no evidence of fraudulent intent at the time of capitalization. See id. at (1), (2).

Moreover, there is no evidence of commingling of personal and corporate assets or disregard of the corporate form. The holding company prepared corporate minutes and records and kept separate bank accounts. See *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 306 (404 SE2d 607) (1991). While appellant testified he sometimes issued payroll checks for employees of various corporations from one corporate account subject to later reimbursement, and the evidence showed he wrote Sands's first check from the account of another company, there is no evidence he commingled *personal* assets with those of the holding company. See *Hickman*, supra at 40-41 (3). In comparison to the actions of the sole shareholder in *Bone Constr. Co. v. Lewis*, 148 Ga. App. 61, 63 (250 SE2d 851) (1978), cited by appellee, in the case at bar there is no evidence that appellant conducted his private and corporate business on an interchangeable basis as though they were one or that he commingled or confused personal and holding company property, records, or control. See *Heyde*, supra at 306-307. Nor is there any evidence of fraud. Like the corporation in *Hickman*, the holding company was shown to be nothing more than an unsuccessful business venture, "not a case of wrongdoing, fraud and bad faith on the part of a corporate [officer]. The . . . record [did] not create an issue of fact for the jury regarding piercing the corporate veil," id. at 41, and accordingly, we hold appellant was entitled to a directed verdict on that issue at the close of appellee's evidence. See *Heyde*, supra.

(c) We also must consider whether any evidence was adduced to support appellee's claim at trial that appellant entered into the recruiting contract individually. Appellant denied acting in his individual capacity and asserted he acted solely on behalf of the holding company, the entity that was seeking to hire a CEO. Appellee's only proof on this issue was the testimony of Richards and the documents and correspondence he prepared during the course of the transaction

at issue. As discussed above, at different times during his testimony Richards stated that the contract was with appellant; that the contract was with appellant on behalf of the investors; that at his initial meeting with appellant Richards listed Marett Properties and the holding company as the client (although he subsequently acknowledged Marett Properties probably was not the client); and that he did not know who appellee's client was.

"The law in this state is that the testimony of a party offering himself as a witness in his own behalf is to be construed most strongly against him when it is contradictory, vague or equivocal [(cit.)]; even as against a directed judgment, [cits.], and that construction most unfavorable to his position should generally be adopted. [Cit.] If that most unfavorable position shows that the party is not entitled to prevail, unless other evidence shows compellingly that he should prevail, he must lose. [Cit.]" *Veal v. Fraser*, 155 Ga. App. 157, 161 (2) (270 SE2d 250) (1980). We find that Richards's testimony must be subjected to this test, for it was confusing, equivocal, and contradictory. Since there was no other evidence adduced to support appellee's theory of individual liability independent of Richards's testimony, appellee was not entitled to prevail on its theory that appellant entered into the recruiting contract in his individual capacity, see generally id. at 160-161 (2), and appellant was entitled to a directed verdict. Accordingly, we reverse the denial of appellant's motions and direct that judgment be entered for appellant in accordance with OCGA § 9-11-50 (b).

2. Because of our holding in Division 1, we need not address appellant's other enumerations of error.

*Judgment reversed with direction. McMurray, P. J., and Andrews, J., concur.*

DECIDED SEPTEMBER 12, 1991.

*Hylton B. Dupree, Jr., Mark A. Johnson*, for appellant.
*Swift, Currie, McGhee & Hiers, Lynn M. Roberson*, for appellee.